FILED & ENTERED

OCT 12 2017

CLERK U.S. BANKRUPTCY COURT
Central District of California
BY Gonzalez DEPUTY CLERK

# UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

## SAN FERNANDO VALLEY DIVISION

In re:

Palmdale Hills Property, Inc. and related Debtors

Debtor(s).

Steven M Speier

Plaintiff(s),

v.

Argent Management, LLC,  SunCal Management LLC

Defendant(s).

CHAPTER 11

Case No.:  8:08-bk-17206-ES
Adv No:   1:16-ap-01120-GM

**MEMORANDUM OF DECISION GRANTING TRUSTEE'S MOTION FOR PARTIAL SUMMARY ADJUDICATION (Dkt. #474)**

Date:  October 3, 2017
Time:   10:00 a.m.
Courtroom:  303

Plaintiff Stephen M. Speier (the "Trustee"), as chapter 11 trustee for debtor SunCal Marblehead, LLC (the "Debtor"), has brought a motion for partial summary adjudication that defendant SunCal Management, LLC ("SCM" and with Argent

1  Management, Inc. ("Argent"), the "Defendants") was an insider of the Debtor.

2

3  **Background and Overview**

4  This motion for partial summary adjudication is made in one of twelve related

5  adversary proceedings now before this Court. The twelve debtors involved in these

6  adversary proceedings are in turn part of a larger related group of twenty-six debtors

7  (the "SunCal Debtors") that were formed to develop residential real estate projects in

8  the Western United States (the "Projects"). (The Debtor's project was located in Orange

9  County and is referred to as the "Project" or the "Marblehead Project.")

10  Defendant SCM was formed to provide development management services to

11  the SunCal Debtors.  Defendant Argent allegedly also provided management services

12  to the Debtors and is allegedly a successor-in-interest, alter ego, *etc.* of SCM.

13  Each of the Projects had received funding from Lehman Brothers Holding, Inc.

14  and related entities (collectively "Lehman"), which had first-priority deeds of trust and

15  equity interests in each Project, and had also agreed to provide continuing funding.

16  Lehman's failure to provide that funding appears to have precipitated the chapter 11

17  filings (seventeen voluntary and nine involuntary) of the SunCal Debtors in November

18  2008.

19  The Trustee had been appointed as the chapter 11 trustee for each of the

20  involuntary SunCal Debtors, including the Debtor, and - through two plans of

21  reorganization governing various SunCal Debtors that were each confirmed in January

22  2012 – was appointed the liquidating trustee of most of the SunCal Debtors, including

23  the Debtor.

24  In May 2012, the Trustee filed the twelve subject complaints (which were twice

25  subsequently amended) against the Defendants seeking to recover substantial

26  payments for management fees and expenses made by the twelve relevant SunCal

27  Debtors to SCM during the four-year period prior to each SunCal Debtor's bankruptcy.

28  These asserted claims for breach of contract, restitution/unjust enrichment, fraudulent

1  transfer, and preferential transfer.  (The operative Second Amended Complaint (the

2  "SAC") in this proceeding was filed on May 14, 2014.)

3       This motion for partial summary adjudication (the "Motion") is made in support of

4  the Trustee's claim for preferential transfer pursuant to Bankruptcy Code §547, which

5  asserts that the Debtor paid over $931,000 to SCM for management fees in the year

6  prior to the Debtor's petition date.  (Section 547 of the Bankruptcy Code extends the

7  "look back" period for potential preferential transfers to "insiders" from 90 days to one

8  year.)

9

10  **Findings of Undisputed Facts**

11       The Debtor is owned 100% by SunCal Marblehead Mezz Borrower, LLC (later

12  known as SunCal Marblehead Heartland Master LLC; the "Parent"), which in turn is

13  owned 100% by SunCal Master JV, LLC ("Grandparent").  UF Nos. 7, 8. *See* Ownership

14  Chart that is Exhibit 1 [Dkt. 486-6] to Declaration of Bruce V. Cook filed in support of the

15  Defendants' Opposition ("Cook Dec.").

16       The Grandparent is owned 15% by SCC JV Ventures, LLC ("SCC JV" or "SCC

17  JV Ventures") and 85% by the Lehman entity SC Master Holdings II, LLC (the "Lehman

18  Fund").  The Lehman Fund and SCC JV Ventures entered into a Limited Liability

19  Company Agreement for the Grandparent (the "Grandparent Operating Agreement"),

20  under which the Lehman Fund was "Manager" of the Grandparent and SCC JV was the

21  "Operating Member."  Ex. 4 to Cook Dec. [Dkt. 486-9].  As Manager, the Lehman Fund

22  had "sole and exclusive management control over" the Grandparent and "all the rights,

23  powers and authority that would be permitted to be exercised by a manager of a limited

24  liability company, except as expressly limited or restricted by this Agreement."  The

25  Manager [Lehman Fund] was directed to "supervise the performance of Operating

26  Member [SCC JV] and exercise the other duties and powers of Manager hereunder . . .

27  ." Grandparent Operating Agreement [dkt. 486-9] §2.1(a).  As Operating Member, SCC

28  JV had the responsibility for the day-to-day operation of the Project, subject to the

supervision of the Manager and compliance with the Project Budget and Plan (defined

as below):

> Operating Member shall manage and administer the day-to-day business and affairs of each Project in accordance with the Current Project Budget and Plan for such Project, subject to the restrictions set forth in this Agreement and the supervisory authority of Manager.  In the performance of its duties, Operating Member shall report to and be subject to the reasonable direction and management of Manager…. Operating Member shall at all times faithfully, competently and prudently perform its duties and responsibilities in compliance with all Laws, the Current Project Budget and Plan for each Project,  and  this Agreement, and in an efficient, thorough, businesslike manner, devoting sufficient time, efforts and managerial resources to the business of the company, and performing such lawful acts as Manager shall reasonably require, in order to achieve the projections set forth in the Current Project Budget and Plan for each Project.

Grandparent Operating Agreement [Dkt. 486-9] §2.2.

To execute its responsibilities, SCC JV was authorized to enter into a

development management agreement for the Marblehead Project "with an entity that is

at all times controlled by Bruce Elieff." Grandparent Operating Agreement [Dkt. 486-9]

§2.5.  SCC JV accordingly entered into a Development Management Agreement dated

June 10, 2005 ("DMA" [Dkt. 486-10; Ex. 5 to Cook Dec]) with SCM.  The DMA provided:

> The [Debtor] is the owner of that certain real property … commonly known as the "Marblehead Coastal Project" (the "Property"). It is the intent of [Debtor] to improve and develop the Property to create buildable residential lots for sale to merchant builders and, if applicable, commercial lots for sale to other developers.
> . . .
> SCC JV Ventures, as the Operating Member of SunCal Masters JV, is obligated to perform certain development management functions with respect to the Project and desires to engage the services of [SCM] to perform certain of such development management functions, as specified in this Agreement.
>
> [SCM] possesses unique and valuable knowledge of the Property and the Project and has sufficient personnel, accounting systems and other infrastructure in place so as to allow it to perform the required development, marketing, and sale of the Project. For that reason, SCC JV Ventures desires to engage the services of [SCM] to perform the development and management functions set forth below in connection with the development, marketing and sale of the Project, and to assist in all aspects of the Project, including, without limitation, to provide, supervise and coordinate all development and construction services in connection with the development of the Project and the marketing and sale of the Property . . . .

DMA [dkt. 486-10] Recitals A, B & C. The DMA describes SCM's authority as

Development Manager as follows:

> Development Manager shall have the authority to perform (and to incur expenses

in connection with the performance of) the Development and Sale Services & Functions to be performed by Development Manager pursuant to the terms of this Agreement, and to otherwise act in accordance with the Project Budget or as may be  otherwise  approved or directed by SCC JV Ventures.  Development Manager shall have no authority to sign on any bank accounts established by the Project Owner or SCC JV Ventures for the Project. Except for the authority granted to Development Manager in this Agreement, Development Manager shall not have the authority to take any action with respect to the Property or Project or incur any expense for which the Project Owner or SCC JV Ventures is or may be responsible, unless Development Manager reasonably deems such action or expense to be necessary in furtherance of the proper development, sale and marketing of the Project.

DMA [dkt. 486-10] §3.1.

The Debtor had no employees.  UF 22. SCM was the Debtor's "developer operator and "management company," responsible for managing the work necessary to develop and sell the Project on the Debtor's behalf. UF 36, 37. SCM's responsibilities included:

- "[r]eview bids and prepare bid analyses";

- "[c]oordinate the work of all contractors . . . [and] schedule and conduct development and progress meetings at which contractors, consultants and [SCM] can discuss jointly such matters as procedures, progress, problems and scheduling";

- "monitor the delivery of, and if necessary, arrange storage, protection and security for, all materials, systems and equipment which are to be used in the development of, or incorporated into, the Project"; and

- "arrange with contractors to provide adequate security for the Project, including, without limitation, prevention of trespassing and dumping";

- "assemble and retain all contracts, agreements and other records and data as may be necessary to carry out [SCM's] functions hereunder, and similar records for functions performed by contractors and other third parties in connection herewith";

- "keep and maintain proper books of contracts and records on behalf of the [Debtor] and SCC JV Ventures relating to . . . the development, operations,

expenses and proceeds of the Property and the lots and other parcels comprising the Property";

- "[r]ecord the progress of the Project and submit to SCC JV Ventures, from time to time as may be requested, and as may be required by any Project Lenders, status reports consisting of (i) a payables transaction report listing all payables due for the month, (ii) a job cost report, (iii) a report explaining any budget variances, (iv) a committed cost report updated to include the invoices being paid during the month, and (v) a cash needs projection showing anticipated cash requirements for the ensuing four (4) months."

UF Nos. 32 AND 3; DMA [dkt. 486-10] §§1.2, 2.3. Although selection of contractors and approval of contracts were reserved to SCC JV Ventures and subject to Project Budgets. DMA [dkt. 486-10] §1.2(a)&(b). The DMA provided that SCC JV would pay SCM a management fee (which could be deferred based on availability of funds) and would reimburse SCM for out-of-pocket expenses incurred by SCM in connection with the Project.  DMA [dkt. 486-10] Art. 5.

SCM managed the development of the Project from 2005 to 2008, and performed all of the day-to-day operations relating to the Project, including

- "Creating and updating (typically monthly but at least quarterly) Project Budgets and Business Plans, and other reports regarding the Project;

- Consulting with the city and other local and state governmental agencies;

- Selecting, engaging, and consulting with, attorneys, architects, engineers, and other contractors with respect to Project entitlements and pre-development, development and construction activities on and off the site . . .;

- Preparing bid packages, negotiating, and preparing agreements and related documents and data for work to be performed by consultants, contractors and third party vendors, inspecting and evaluating such work, and interacting with lender engaged construction monitors with respect to such work; . . .

- Causing to be prepared and processed architectural and landscape design guidelines and obtaining necessary approvals;

- Engaging employees of SCM in connection with its activities on behalf of the Debtor that worked directly on the Project . . .;

- Processing and forming Community Facilities Districts that would provide financing for the development of public infrastructure improvements;

- Constructing sewer mains, water lines, and other utilities and roads;

- Constructing a bridge across the Project; and

- Obtaining and coordinating the issuance of bonds for the construction of improvements and causing the bonds to be posted as necessary to record final maps and other improvements[.] . . ."

UF 44.  Among many services provided by SCM, SCM handled all accounting for the Project, which included processing and paying invoices from vendors to the Project (including SCM's invoices for management fees and expenses under the DMA). UF Nos. 45-47.  Although the DMA provided for SCC JV to pay SCM's management fees and expenses, SCM invoiced the Debtor for its fees and expenses and was paid by the Debtor. DMA [dkt. 486-10] §5.1; UF Nos. 47-50.  (However, it should be noted that the DMA (§5.1) and other agreements regarding the Project do contemplate that SCM's management fees and expenses were ultimately to be funded by the Debtor or from Project Loans by Lehman to the Debtor. The Debtor's ultimate funding responsibility is not directly at issue in this motion, so the Court is not making any finding – one way or the other – as to the content or meaning of the DMA and the other agreements on the issue of the Debtor's ultimate responsibility for SCM's management fees and expenses.)

SCM's invoices were processed and paid through the Debtor's usual vendor payment process.  Vendor payments did not occur until SCM, the Debtor, and Lehman had agreed to the current project budget and plan (the "Project Budget and Plan"). SCM would then submit (usually monthly) draw requests pursuant to that Project Budget to

Lehman. The draw request would be based on vendor invoices that had been reviewed and approved by SCM and would identify the amount payable to each vendor.  If Lehman agreed to the draw request, it would then – as lender to the Project - provide the Debtor with the funds to pay the amounts requested.  Declaration of Danielle Harrison [dkt. 486-18] ¶¶ 5, 7, 9, 14, 16, 19 & Ex. 21.  SCM would then issue a check or wire funds from the Debtor's account to the vendors.  UF Nos. 48-53.  Payments made under this process included $931,007.50 paid to SCM on December 31, 2007. UF Nos. 54, 55.

SCM and the other SunCal entities discussed above were inter-related, primarily through Bruce Elieff, who:

- owned 100% of and served as Manager of SCM,

- served as the President of the Debtor,

- served as the Manager of SCC JV, which owned 15% of the Grandparent, had responsibility for the day-to-day operation of the Project (subject to supervision by the Lehman Fund) under the Grandparent Operating Agreement, and engaged SCM under the DMA; and

- owned 100% of and served as President of SCC Acquisitions, Inc. ("SCC Acquisitions"),  which owned a majority interest in SCC Acquisitions, LLC, which in turn owned 100% of SCC JV.

UF Nos. 6 [as modified by Defendants], 11, 12, 13 [as modified by Defendants], 14 & 25. SCM's general counsel, Bruce Cook, was also SCC JV's general counsel and had executed the DMA on behalf of both SCM and SCC JV.  UF. Nos. 26, 27. He also drafted the Debtor's LLC agreement.  UF Nos. 28.  Frank Faye, SCM's Chief Operating Officer, was also an officer of the Debtor. UF No. 29.  However, SCM had no ownership interest in the Debtor.

**Motion**

Statutory Insider

SCM was a statutory insider of the Debtor, *i.e.*, an insider specifically identified in the Bankruptcy Code definition of "insider." This definition - in the case of a Limited Liability Company such as the Debtor - is found in Bankruptcy Code §101(31)(B),(E),and (F).

The term "insider" includes—
...
(B) if the debtor is a corporation—
    (i) director of the debtor;
    (ii) officer of the debtor;
    (iii) person in control of the debtor;
    (iv) partnership in which the debtor is a general partner;
    (v) general partner of the debtor; or
    (vi) relative of a general partner, director, officer, or person in control of the debtor;
...
(E) affiliate, or insider of an affiliate as if such affiliate were the debtor; and
(F) managing agent of the debtor.

11 U.S.C § 101(31). SCM falls within this definition in three ways.

SCM was the Debtor's affiliate, making SCM an insider under §101(31)(E)("affiliate"). The Bankruptcy Code defines affiliate as, among other things, an "entity that operates the business or substantially all of the property of the debtor under a lease or operating agreement." 11 U.S.C. §101(2)(D). Frank Faye, SCM's Chief Operations Officer, testified that SCM was the Debtor's "developer operator" and "management company." Under the DMA, SCM was tasked with providing "all development and construction services" for the development of the Marblehead Project. While the DMA may not have been labelled as an "operating agreement," it is the substance of the arrangement - not the title of document - that defines an affiliate.

SCM was also an insider of the Debtor's affiliate (Bruce Elieff), making SCM an insider under §101(31)(E)("insider of an affiliate as if such affiliate were the debtor"). First, Bruce Elieff was the Debtor's affiliate, because he (i) managed SCC JV (which was responsible for managing the Marblehead Project) pursuant to the Grandparent Operating Agreement and (ii) directly managed the Debtor's business and the Debtor's

1   primary assets (the Project) as SCC JV's controlling manager and SCM's controlling

2   owner. Second, SCM was an insider of Bruce Elieff, because it is "a corporation of

3   which [Elieff] is a director, officer, or person in control." 11 U.S.C. §101(31)(A)(iv). Mr.

4   Elieff meets this standard: he served as SCM's Manager and owned 100% of its stock.

5       SCM was also the Debtor's managing agent, making SCM an insider under

6   §101(31)(F)("managing agent of the Debtor").  A "managing agent" has been held to be

7   an entity that exerts or could exert "operational control" over the debtor.  Here, SCM had

8   the authority to incur and pay obligations on the Debtor's behalf, as part of its

9   responsibility for all aspects of the Debtor's operations. The Debtor had no employees

10  and could only act through SCM.

11

12  Non-Statutory Insider

13      Section 101(31) uses the word "includes" before its list of insider relationships to

14  connote that the definitions in subsection (31) are not exclusive. "Insiders" not defined in

15  §101(31) are "non-statutory insiders."

16          A creditor is not a non-statutory insider unless: (1) the closeness of its
        relationship with the debtor is comparable to that of the enumerated insider
17      classifications in § 101(31), and (2) the relevant transaction is negotiated at less
        than arm's length.
18

19  In re The Vill. at Lakeridge, 814 F.3d 993, 1001 (9th Cir. 2016), cert. granted in part sub

20  nom. U.S. Bank Nat. Ass'n v. Vill. at Lakeridge, 137 S. Ct. 1372 (2017).

21      The close relationship with the debtor that may make an individual an insider has

22  been found

23          "where such relationship compels the conclusion that the individual or entity has
        a relationship with the debtor, close enough to gain an advantage attributable
24      simply to affinity rather than to the course of business dealings between the
        parties." Id. at 1005 (quoting In re Enter. Acquisition Partners, Inc., 319 B.R. 626,
25      631 (9th Cir. BAP 2004)); Friedman v. Sheila Plotsky Brokers, Inc. (In re
        Friedman), 126 B.R. 63, 70 (9th Cir. BAP1991)(emphasis added).
26

27  In re Rexford Properties, LLC, 557 B.R. 788, 797 (Bankr. C.D. Cal. 2016).  Here, SCM

28  and the Debtor share common officers and ownership. Bruce Elieff is SCM's 100%

owner and the Debtor's President and Manager.  He was also SCC JV's controlling
manager and the President of its upstream owner.  SCC JV held an indirect ownership
interest in the Debtor and was also responsible for the Debtor's operations under the
Grandparent Operating Agreement.  SCC JV delegated its duties to SCM under the
DMA, so SCM managed the Debtor's day-to-day affairs.  This close relationship
between the Debtor and SCM far exceeds the one found by the court in *Rexford
Properties*.

The transactions at issue in this Motion were made by SCM from the Debtor's
account, despite the fact that the Debtor had no legal obligation to pay the fees.  SCM
directed the Debtor's operations. These payments cannot be called an arms' length
transaction.

[Note from the Court: The Motion also relied on several admissions by Bruce
Cook (SCM's general counsel) and by SCC Acquisitions as to SCM's insider status.
However, conclusory admissions of insider status by the various parties will not be
considered, because they have no bearing on the Court's analysis of whether SCM
meets the standards for an insider under Bankruptcy Code §101(31).]


**<u>Opposition</u>**

SCM did not control the Debtor, because Lehman did.

SCM was not paid management fees on an *ad hoc* basis or at its discretion, but
according to a process that Lehman fully controlled.  Invoices were paid only if they had
been approved by Lehman. As Lehman had no ownership interest in SCM, payment of
the management fees was on an arms' length basis.

The Trustee bears the burden of proving that SCM is an insider for preference
purposes.  11 U.S.C. §547(g).  Determination of insider status is a mixed question of
law and fact, with courts focusing on the question of control.

SCM was not an affiliate of the Debtor: it was not an entity that "operates the
business or substantially all of the property of the debtor under a lease or operating

1  agreement" under §101(2)(D)'s definition of affiliate.  SCM was party to a management

2  agreement, not a lease or operating agreement. The difference is more than semantics

3  and courts in the Ninth Circuit have recognized it is inappropriate to expand the

4  statutory insider definition.  Under the Grandparent Operating Agreement, the powers

5  that SCC JV could delegate to SCM were subject to restrictions and the supervisory

6  authority of the Lehman.

7       SCM was not an insider of the Debtor's affiliate, because Bruce Elieff was not an

8  affiliate of the Debtor.  He did not own 20% or more of the voting securities of the

9  Debtor and he did not operate the business or substantially all of the property of the

10  debtor under a lease or operating agreement. Elieff's alleged control was through SCM

11  or SCC JV.  Thus, the Trustee's argument ignores corporate distinctions, an

12  unwarranted expansion of the definition of statutory insider. Furthermore, any direction

13  provided by Elieff was subject to the absolute control of Lehman.

14       SCM was not the Debtor's managing agent.  To be a "managing agent" requires

15  operational control over the Debtor or a significant portion of the Debtor's assets, which

16  SCM did not have.  SCM's limited powers were to perform services for the Debtor.

17  SCM's authority under the DMA was quite limited.  Furthermore, the authority that SCC

18  JV could grant to SCM is circumscribed by SCC JV's own authority, which is subject to

19  the limitations in the Grandparent Operating Agreement, namely Lehman's supervision

20  and compliance with the Project Budgets and Plan.  In contrast, the Lehman Fund had

21  "sole and exclusive management control" over the Grandparent.  *Id.* §2.1.  In the

22  context of responsibility for negligent subcontractors, operational control has been

23  defined to require a degree of control over the manner in which the work was done.

24  SCM did not have control.

25       SCM was not a non-statutory insider, which is a case-by-case and fact-intensive

26  determination.

27       First, SCM and the Debtor did not have a relationship close enough to provide

28  SCM with an advantage attributable to affinity rather than course of dealings. The

evidence shows that Lehman did not show SCM any preferential treatment in its

decisions regarding who the Debtor paid. No evidence shows the payments were made

based on some affinity, as opposed to the need to have a development manager assist

with developing the Project.  The Trustee relies on the *Rexford* case, which is

inapposite to this case, as it involved family members and ownership interests in the

Debtor.  Insider status is a question of control, and SCM lacked control over the Debtor.

It had the power to recommend payments but it lacked the power to compel payments.

Second, transactions are at arms' length when done according to similar

standards under which unrelated parties would act. In this determination, control - the

ability to compel payment by the Debtor - is important.  However, the Trustee continues

to ignore the fact that Lehman – not SCM or Bruce Elieff – controlled the Debtor.  And

Lehman was not beholden to SCM or Bruce Elieff and had every incentive to act in the

Debtor's best interests.

**Reply**

If an entity fits squarely within one of the definitions of the statutory example of

insider, it is an insider. There is no need to consult the factors used by courts in

determining non-statutory insider status.

SCM was the Debtor's affiliate under §101(2)(D) (and thus insider under

§101(31)(E)) because there is no question that SCM operated the business and all of

the property of the Debtor.  Requiring that SCM's operations be under a formal "lease or

operating agreement" elevates form over substance and will only encourage parties to

manipulate the titles of their documents.  The Bankruptcy Code is not to be read in a

way to produce such absurd results.

Bruce Elieff was an affiliate of the Debtor because the Grandparent Operating

Agreement made SCC JV (of which Elieff was the Manager) in charge of managing the

Project's day-to-day operations and authorized SCC JV to delegate its duties to an

entity controlled by Elieff. Elieff operated the Project by way of his overall supervision

1    and weekly meetings on the Project.  SCM was an insider of Elieff, so SCM is "an

2    insider of an affiliate of the Debtor," meeting the definition of insider under §101(31)(E).

3          Lehman's supervision and oversight does not prevent SCM from being the

4    Debtor's "managing agent" and thus an insider under §101(31)(F).  The standard for

5    managing agent is "operational control." *In re Standard Stores, Inc.,* 124 B.R. 318

6    (Bankr. C.D. 1991). The examples of managing agents given in *Standard Stores* would

7    all have been subject to the "veto power" of superiors in the corporate structure, so

8    unfettered control is clearly not required.  Under the DMA, SCM had the exact type of

9    operational control described in *Standard Stores*: incurring expenses, managing

10   payments, maintaining books and records, and generally performing the day-to-day

11   operations of the Project. The Defendants citation to negligence case law highlights the

12   weakness of their argument that SCM is not a managing agent of the Debtor.

13          The Defendants have not raised a genuine issue regarding "non-statutory

14   insider" status. The issue is closeness and the prospect of unfair advantage, not control.

15   The relationships in this case are analogous to those in *In re Rexford Props., LLC*, 557

16   B.R. 778 (Bankr. C.D. Cal. 2016), which were sufficiently close to give rise to insider

17   status. The payments to SCM were not arms' length: they were not made in the manner

18   in which unrelated parties would carry out a transaction. SCM had the Debtor make

19   payments to SCM that the Debtor had no legal obligation to pay.

20

21   **<u>Analysis</u>**

22   <u>Summary Judgment/Adjudication Standard</u>

23          Summary judgment (on all or on part of a claim) is proper when the pleadings,

24   discovery, and affidavits show that there is "no genuine dispute as to any material fact

25   and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

26   Material facts are those which may affect the outcome of the proceedings.  *Anderson v.*

27   *Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). A factual dispute is genuine where the

28   evidence is such that a reasonable jury could return a verdict for the non-moving party.

*Id.* The party moving for summary judgment/adjudication bears the burden of identifying those portions of the pleadings, discovery, and affidavits that demonstrate the absence of a genuine issue of a material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The facts must be viewed in the light most favorable to the party opposing the motion. *Anderson*, 477 U.S. at 249; *Masson v. New Yorker Magazine,* 501 U.S. 496, 520 (1991).

Overview of Facts

The facts relevant to this motion are generally not in dispute.  It is undisputed that SCM was responsible for and indeed did the work of developing the Project, whether its day-to-day work is termed "managing" or "operating."  It is also undisputed that SCM's work was subject to the direction and control of Lehman. It is also undisputed that SCM employees (working on the Debtor's behalf) reviewed SCM's invoices to the Debtor and issued the resulting payments to SCM (including the $931,000 payment at issue in the preference claim). However, it is also not disputed that invoices (including SCM's invoices for management fees and expenses) were not paid until they had been sent to Lehman as part of a draw request and Lehman had approved the invoices by paying the draw request.  Not surprisingly, the Trustee's argument on the definition of "insider" focuses on day-to-day operations and the Defendants' argument focuses on "control."

Statutory Insider – SCM as an affiliate of the Debtor under §101(2)(D)

Under §101(31)(E) "insiders" includes "affiliates," which are defined in §101(2). The Trustee asserts that SCM falls within the definition of affiliate in §101(2)(D): an "entity that operates the business or substantially all of the property of the debtor under a lease or operating agreement."

As noted above, it is not disputed that SCM operated the Debtor's business and substantially all of its property by providing the development and sales services for the Project.  Development of the Project was the Debtor's business, and SCM and its

employees were conducting that business.

However, SCM argues that the DMA is not the "lease or operating agreement" plainly required by §101(2)(D) and that the Ninth Circuit B.A.P. has held that the definition of statutory insider should not be expanded beyond the categories plainly contained in the statute, unless the entity meets the test for non-statutory insiders. *In re Enter. Acquisition Partners, Inc.,* 319 B.R. 626, 633 (B.A.P. 9th Cir. 2004).  Thus, the issue is whether "lease or operating agreement" can be interpreted to include the "Development Management Agreement" under which SCM conducted the day-to-day operations of the Debtor.

The cases interpreting the meaning of "lease or operating agreement" in §101(2)(D) are not particularly helpful: they are not numerous, have not been within the Ninth Circuit, usually have arisen in context other than preferences, and have interpreted the phrase inconsistently. Some of these cases have applied "lease or operating agreement" rather flexibly. *See In re Am. Hous. Found.,* 785 F.3d 143, 156–57 (5th Cir. 2015), as revised (June 8, 2015), (applying §101(2)(C) to partnership agreements under which entity exercised "full control") (§510(b)); *In re Chira,* 353 B.R. 693, 724–25 (Bankr. S.D. Fla. 2006) ("the hotel also represented substantially all of Denis' property. Elizabeth and Lounge Corp. are both "entities," and they both operated the business and property of the Sheldon Beach Hotel at the times when most of Elizabeth's unfair conduct occurred") (equitable subordination), *aff'd,* 378 B.R. 698 (S.D. Fla. 2007), *aff'd,* 567 F.3d 1307 (11th Cir. 2009); *In re Century Inv. Fund VII Ltd. P'ship*, 96 B.R. 884, 892 (Bankr. E.D. Wis. 1989)(§327(a)) ("CMG has certainly been managing all of the property of the debtor under its management agreement)(retention of property manager).  Other courts, however, have interpreted the requirement more strictly.  *In re Washington Mut*., 462 B.R. 137, 145–46 (Bankr. D. Del. 2011)("The Court finds that the Debtors have not adequately proven that the Pooling and Servicing Agreements constitute an operating agreement under the plain meaning of the statute.") (equitable subordination); *In re Sporting Club at Ill. Ctr*., 132 B.R. 792, 797 (Bankr.N.D.Ga.1991)

1  (determining that entity was not an affiliate of debtor for purposes of venue statute

2  where the debtors were not "parties to any lease or operating agreement").

3         Principles of statutory construction lead this Court to conclude that SCM does not

4  fall within the definition of affiliate in Section §101(2)(D), because it did not operate the

5  Debtor under "a lease or operating agreement."

6         While the Ninth Circuit B.A.P.'s decision was not interpreting "lease or operating

7  agreement," it holds generally that, as a matter of statutory construction, "insider" status

8  should only be placed on parties that fall "within the categories specifically listed in the

9  definitional statute." *Enter. Acquisition,* 319 B.R. at 633 (B.A.P. 9th Cir. 2004).  The

10  rationale for that holding is even stronger in this case. *Enter. Acquisition* considered one

11  of the definitions in §101(31), which by use of the word "includes" is not limiting "insider"

12  to its six sub-parts.  In this case, we are considering whether SCM is an insider by

13  reference to the definition of affiliate in §101(2), which uses the word "means" before its

14  four sub-parts. "By using the word 'means' rather than 'includes,' Congress enacted a

15  precise and restricted definition." *Wilson v. Huffman (Matter of Missionary Baptist*

16  *Found.),* 712 F.2d 206, 210 (5th Cir. 1983). Thus, the B.A.P.'s requirement that the

17  insider relationship be specifically named in the statutory definition is particularly

18  compelling in this case.

19         Subsection §101(2)(D) explicitly requires that the entity operating the Debtor do

20  so under "a lease or operating agreement."  This phrase would have no meaning if

21  merely operating the Debtor were sufficient.  And if operating the debtor under *any*

22  agreement were sufficient, there would be no reason to have the words "lease or

23  operating" preceding the word "agreement." Courts have an "interpretive obligation to try

24  to give meaning to all the statutory language." *Bank of Am. v. 203 N. LaSalle St. P'ship*,

25  526 U.S. 434, 452 (1999). "Operating agreements" have specific meanings in the law of

26  limited liability companies and for oil and gas rights.  The DMA is not one of these

27  operating agreements. Terming the DMA to be an "operating agreement" would be

28  expanding the definition of affiliate (and thus insider) beyond what is plainly contained in

1 | the statute.

2

3 | <u>Statutory Insider – SCM as an insider of an affiliate of the Debtor</u>

4 |      Subsection 101(31)(E) also includes "insider of an affiliate as if such affiliate were

5 | the debtor" within the definition of insider. The Trustee asserts that SCM is an insider of

6 | Bruce Elieff, who is an affiliate of the Debtor.

7 |      There is no dispute that - under §101(31)(A)(iv) - SCM is an insider of Mr. Elieff,

8 | who is an officer, director and person in control of SCM.

9 |      The issue is whether Mr. Elieff is an affiliate of the Debtor, *i.e.,* whether he

10 | "operate[d] the business or substantially all of the property of the [D]ebtor under a lease

11 | or operating agreement." 11 U.S.C. 101(2)(D). The Trustee has submitted evidence that

12 | Mr. Elieff "personally monitored, participated in, and oversaw others" in SCM's business

13 | and the Project.  However, the statute says "operate" (not "control" or "supervise'). Mr.

14 | Elieff no doubt oversaw SCM's operations and as well as each of the 26 SunCal

15 | Projects, but this is a far cry from operating each of these Projects and Debtors.  If any

16 | non-Debtor entities "operated" the Debtor and/or the Marblehead Project, it was SCM or

17 | SCC JV.  Bruce Elieff, SCM, and SCC JV are separate legal entities.  Elieff may own

18 | and control SCM and SCC JV, but – as a matter of basic corporate law - that does not

19 | mean that SCM or SCC JV's actions are also Elieff's actions.

20

21 | <u>Statutory Insiders – SCM was a Managing Agent of the Debtor</u>

22 |      Under §101(31)(F) "insiders" includes a "managing agent of the debtor."  There is

23 | little case law interpreting this phrase. The only decision considering the meaning of

24 | "managing agent" at any length concluded that the definition was a matter of

25 | "operational control."

26 |      Unfortunately Congress did not define "managing agent" as precisely as it defined "relative." In fact, Congress has not defined this term. A leading

27 | commentator offers no help. 2 Collier on Bankr. ("Collier") ¶ 101.30 (15th Ed.). Courts have provided little guidance in published decisions. *See, In re National*

28 | *Real Estate Ltd. Partnership II*, 87 B.R. 986 (Bankr.E.D.Wis.1988) (real property manager held to be insider within meaning of 11 U.S.C. § 101(30)(F) with no

1    stated analysis).

2          Therefore, the term "managing agent" is ambiguous. In construing an ambiguous provision in a statute, a court should construe it so that it is consistent

3    with the entire statute. *Board of Educ. of Westside Community Schools v. Mergens*, 496 U.S. 226, 110 S. Ct. 2356, 2383, 110 L.Ed.2d 191 (1990).

4          The focus of nearly all the subdivisions of § 101(30) is on those entities that exert or could exert control or influence over the debtor. There are

5    exceptions; e.g., a relative of a director or officer of a corporate debtor is an insider whether or not that relative could exert control or influence over the debtor.

6          In defining "managing agent," I therefore conclude that it refers to those entities that exert or could exert operational control over a debtor, a division or

7    unit of a debtor, or a significant portion of a debtor's property. Such operational control would ordinarily include the ability to make personnel decisions, the

8    authority to incur or pay obligations and access to financial and other information essential to the operation of the debtor. An example of a "managing agent" would

9    be a person in charge of a division of a corporate debtor who, nevertheless, is not an officer or director.

10          This definition of "managing agent" is consistent with the principal design of § 101(30) and does not overlap or conflict with the categories of insiders

11    expressly described in the preceding subsections of that statute. As an employee of Debtor, Riddle was an agent of Debtor. He was also the general manager of

12    Debtor. Nevertheless, Riddle did not have the authority to pay or direct payment of obligations, he could not order parts, and he could not hire or fire store

13    managers without the express authorization of Freeman and Bauer. Therefore Riddle was not an insider of Debtor at the time of the Transfer pursuant to §

14    101(30)(F).

15    *Rush v. Riddle (In re Standard Stores, Inc.),* 124 B.R. 318, 323–24 (Bankr. C.D. Cal.

16    1991)(Zurzolo, J.); *see also In re City of Columbia Falls, Mont., Special Imp. Dist. No.*

17    *25*, 143 B.R. 750, 765–66 (Bankr. D. Mont. 1992)(applying *Standard Stores* to find that

18    a city was the "managing agent" of the debtor special improvement districts, as the city

19    had "'authority to incur or pay obligations,' as well as 'access to financial and other

20    information essential to the operation of the debtor'").

21          Under this standard, SCM exercised operational control over the Debtor and thus

22    was a managing agent.  All three factors indicating such control in *Standard Stores*

23    exist: although its actions needed to be in accord with the Project Budgets, SCM had

24    authority to incur expenses on the Project, ability to make personnel decisions (as the

25    Debtor's operations were all conducted by SCM employees), and access the Debtor's

26    books and records (which it maintained).  It is undisputed that SCM conducted the

27    Debtor's operations.  While its actions may have been subject to the Lehman-approved

28    Project Budget and Plan and Lehman may have had veto power over all payments, the

standard does not demand unfettered control over the debtor. *Standard Stores* used a person in charge of a division of a corporate debtor as an example of a managing agent and cited the authority to direct payment of obligations, employ personnel, or order supplies as hallmarks of such control. Such people would still be subject to supervision and veto power by the officers and board of directors of the company.

The terminology used by the parties to describe SCM's duties supports the conclusion that SCM was the "managing agent" of the Debtor: SCM was the "Development *Manager*" under a "Development *Management* Agreement." *See, e.g., In re Interwest Bus. Equip. v. United States Trustee (In re Interwest Bus. Equip.)*, 23 F.3d 311, 318 (10th Cir. 1994)("As a manager of Green Street, Retail is an "insider" of that debtor within the meaning of 11 U.S.C.A. §101(31)(F) ("managing agent of the debtor").")

Thus, the Court finds that - as a matter of undisputed fact - SCM was a "managing agent" of the Debtor within the meaning of §101(31)(F) and thus a statutory insider of the Debtor under 11 U.S.C. §101(31).

Non-Statutory Insider

The Ninth Circuit recently set forth the standard for finding an entity to be a non-statutory insider and focused on close relationships, rather than control.

> Non-statutory insiders are the functional equivalent of statutory insiders and, therefore, must fall within the ambit of § 101(31). *See In re Winstar Commc'ns, Inc.*, 554 F.3d at 395. A creditor is not a non-statutory insider unless: (1) the closeness of its relationship with the debtor is comparable to that of the enumerated insider classifications in § 101(31), and (2) the relevant transaction is negotiated at less than arm's length. *See Anstine v. Carl Zeiss Meditec AG (In re U.S. Med., Inc.)*, 531 F.3d 1272, 1277 (10th Cir. 2008). A court cannot assign non-statutory insider status to a creditor simply because it finds the creditor and debtor share a close relationship. *See id.* at 1277–78.
>
> A court must conduct a fact-intensive analysis to determine if a creditor and debtor shared a close relationship and negotiated at less than arm's length. Having—or being subject to—some degree of control is one of many indications that a creditor may be a non-statutory insider, but actual control is not required to find non-statutory insider status. *See id.* at 1277 n. 5. Likewise, access to the debtor's inside information may—but shall not—warrant a finding of non-statutory insider status. *See id.* at 1277.

*In re The Vill. at Lakeridge*, 814 F.3d 993, 1001–02 (9th Cir. 2016), *cert. granted in part sub nom. U.S. Bank Nat. Ass'n v. Vill. at Lakeridge,* 137 S. Ct. 1372 (2017); *see also Schubert v. Lucent Techs. (In re Winstar Comm'ns., Inc.*), 554 F.3d 382, 396–97 (3d Cir.2009)("It is not necessary that a non-statutory insider have actual control; rather, the question 'is whether there is a close relationship [between the debtor and creditor] and ... anything other than closeness to suggest that any transactions were not conducted at arm's length."); *In re Rexford Properties, LLC*, 557 B.R. 788, 797 (Bankr. C.D. Cal. 2016)(Barash, J.)(issue is whether relationship is "close enough to gain an advantage attributable simply to affinity").  Thus, the B.A.P.'s statement in *Enterprise Acquisition* that non-statutory insider status "requires some degree of control" (319 B.R. at 633) appears to be overruled by *Vill. at Lakeridge*.

   The first issue is whether SCM's closeness with the Debtor "is comparable to that of the enumerated insider classifications in § 101(31)." Just prior to enumerating these classifications, the legislative history of subsection (31) stated: "[a]n insider is one who has a sufficiently close relationship with the debtor that his conduct is made subject to closer scrutiny than those dealing at arms' length with the debtor."  H.R. Rep. No. 595, 95th Cong., 1st Sess. 312 (1977); S. Rep. No. 989, 95th 2d Sess. 25 (1978) U.S. Code Cong. & Admin. News 1978 pp. 5787, 5810, 6267.  Again, it is beyond dispute that SCM conducted the Debtor's day-to-day operations, its employees conducted all of the Debtor's business functions, and it maintained the Debtor's books and records.  It had "some degree of control" and access to the Debtor's information and records, both of which are indications of insider status cited by the Ninth Circuit in *Vill. at Lakeridge.* It was also close enough for SCM to gain some advantage due simply to affinity: even if all of the Debtor's payments needed Lehman's prior approval, SCM was responsible for the first line review of its own invoices and had some control over when its invoices were submitted for approval and were paid. This extremely close relationship between SCM and the Debtor was of the type that Congress intended to subject to "a greater level of scrutiny."

The second prong of the test focuses on the subject transaction itself, requiring that it be "at less than arm's length."  The *Vill. at Lakeridge* decision cited the definition of "arms' length transaction" in *Black's Law Dictionary* (10th ed. 2014):

> 1. A transaction between two unrelated and unaffiliated parties. 2. A transaction between two parties, however closely related they may be, conducted as if the parties were strangers, so that no conflict of interest arises.

814 F.3d at 1001 n.11; *see also Rexford Props.*, 557 B.R. at 800. Since SCM and the Debtor were neither unrelated nor unaffiliated, the issue is whether – under part 2 of the definition - the payments of SCM's management fees and expenses were "conducted as if the parties were strangers, so that no conflict of interest arises."

However much control Lehman may have had over the Project, the Project Budgets, the draw requests, and the vendor payments, it is undisputed that SCM processed, reviewed, and paid its own invoices on the Debtor's behalf. An SCM employee actually issuing the Debtor's payment to SCM was not a transaction conducted "as if the parties were strangers."  A conflict of interest does not require nefarious behavior by SCM, merely the potential for abuse, which (as described above) existed. These payments to SCM cannot be called "arms' length transactions."

**Conclusion**

The Trustee has established that - as a matter of undisputed fact - SCM is an "insider" of the Debtor because it was (i) a "managing agent" of the Debtor within the meaning of 11 U.S.C. (31)(F) and (ii) a non-statutory insider of the Debtor.  Motion granted.

**EVIDENTIARY OBJECTIONS**

**Defendants' Evidentiary Objections to the Declaration of Gary Pemberton**

#1 – sustained

1  **Trustee's Evidentiary Objections**

2       The Trustee has interposed numerous objections to the eleven declarations filed

3  by the Defendants in support of their opposition to this motion.  This ruling has primarily

4  relied on the Trustee's own statement of undisputed facts, so it will only consider the

5  few evidentiary objections to the declaration testimony actually relied upon in this ruling.

6  Declaration of Danielle Harrison

7  #1 – overruled

8  #3 – overruled

9  #5 – sustained

10  #10 – overruled

11  #12 – overruled

12  #13 – sustained

13  #15 – overruled

14

15  ###

16

17

18

19

20

21

22

23

24  

Date: October 12, 2017

25  

Geraldine Mund
United States Bankruptcy Judge

26

27

28